This is a case of an innocent young woman from western Samoa who was raised as a devout Mormon and she unfortunately fell in love with and married the wrong guy. She married a guy who the record makes pretty clear was a two-faced, two-timing philanderer who probably just wanted to add her as one more woman on his string of conquests. As if that weren't bad enough to add insult to injury, then the government put her on the spot because they were investigating her husband for a criminal matter and they hoped that if they put her in a tight situation, they'd be able to get her to testify and assist the Naval Criminal Investigative Service. In fact, the government's own agent, Mr. Lacek, testified on page 270, I believe, in lines 10 to 15 that if she would be willing to help the NCIS, that the Immigration Service and the Department of Homeland Security would be willing to help her. The government characterizes de novo review in its brief as apparently restricting the court to only My understanding of de novo review is that means the factual matters, all of the record, will be reviewed afresh and reviewed anew. The government also makes considerable reliance upon the implied lack of credibility on the part of the petitioner and her witnesses. Apparently unfamiliar with the jurisprudence of this court, which is consistently held, that testimony must be accepted as true in the absence of any adverse credibility finding and that implicit credibility observations do not constitute a credibility finding. She filled out a number of government forms indicating that she was single and or that McKinney, is that his name? Yes. Was her boyfriend versus being her husband. How do you deal with that? Well, her friends have testified she was a very private person. Some of these, one can certainly argue that you might not list, for tax reasons, you might not list a person as your spouse if you intend to file separately. But other reasons apparently relate to the fact that where she was employed, there was a great deal of rumor mongering going around. She also, I think, at some point in the relationship, it's pretty clear, had her own intimations about his infidelity. And at one point, when asked why she characterized him as a boyfriend, she candidly stated that in some respects he acted more like a boyfriend than he did like a husband. In any case, this was a joint petition. And in a joint petition, the burden is upon the government to demonstrate by a preponderance of the evidence that the marriage was fraudulent. The burden is on the government. We respectfully submit that burden was not met. Now, this court has held in the past that one cannot assume that an immigration judge considered information which is not addressed in that judge's decision. We also have the court's jurisprudence that if there's no adverse finding of credibility, that all the testimony has to be taken as true. Regrettably, our immigration judge elected not to take into consideration all of that testimony which must be deemed as true. And the evidence is filled with testimony to show that this was indeed a bona fide marriage. She, for example, had her bishop testify. And her bishop testified that when he discussed the relationship with her, she had told him that she married this man out of love, not for any other inappropriate reasons. Now, if this were a fraudulent marriage, why would she go against the tenets of her own religion and the confidentiality of her relationship with her bishop to lie to her bishop about this? We also have the testimony of her teacher and counselor within the church who expressed her concern that Miss Pogai was spending so much time with Mr. McKinney that they were afraid this might actually be taking her away from the church. That to me is not evidence of a fraudulent marriage. We have the written testimony and statements submitted by her friends and roommates about the amount of time she was spending with him, their dating, their courtship relationship, the fact that he would actually come over to the apartment where she lived with her roommates and that they would spend the night together there on occasion. We have her best friend, Darren Nakamura, testifying that even when she was concerned about his infidelity, her primary focus was to somehow make that marriage work. And this is what she candidly testified and told to her best friend. This is not the evidence of somebody who was in a fraudulent marriage. I think if you wanted to sum this case up as briefly as possible, we've got a classic Frankie and Johnny story. He was her man and he'd done her wrong. And he'd done her real wrong. But that does not mean that she should be punished for his wrongdoing. Her motivation when she married him, as is a lot of love, and even when she felt the marriage might be going bad, she wanted to do whatever she could to preserve it. It's obviously part of your position that it was entirely appropriate for your client to offer up as one indicia of the validity of this marriage that she had disgusted with a representative of her faith. Is that correct? That's correct. Is it then the flip side of that that it would have been okay for the I.J. to ask your client why as a member of the LDS faith she chose a civil as opposed to a church wedding? If your proof was within limits, was the I.J.'s question also within limits? I think it was within limits. But I think the answer is simply that he was not a member of the faith. And in fact, her bishop and other members of her church did testify that it is certainly preferable under the Church of Latter Day Saints to have that marriage done within the church. And they certainly want the spouses of their church members to become members of the church. It's pretty clear he wasn't about to do that. So the option that they had was to marry outside of the church. I didn't personally discuss this with her. I think she probably would have preferred that he sort of come into the fold. But for whatever reason, she had fallen in love with this guy and was going to marry him and make a life with him, even if it didn't fit entirely within the traditional doctrines of the Church of Latter Day Saints. You have a few minutes left. Would you like to save it for recovery? I'd like to do that. Thank you very much for your argument. We'll hear from the government at this time. May it please the Court, Donald Kubion for a respondent, Your Honors. Your Honors, the most remonstrable thing about the petitioner's position in this case continues to this moment, which is a refusal to address the most damaging evidence in the case, which is the admission by both the petitioner and her purported spouse that they entered into this relationship for the purpose of each getting something out of it. They were lovers before they went through the marriage ceremony, and it appears, for what it's worth, that that may have lessened thereafter. But if this is a case where one has to actually struggle to find good indicia of a marital intention, the only thing they did that is beyond question, or is not questionable, is they went through a marriage ceremony. They probably lived on and off together before they married. That's what the roommate said. But after the marriage, they never lived together until, at least purportedly, until shortly before the second time they appeared at INS for a benefit, which was to remove the condition on her residency status. They conspired to lie on both occasions, and did lie on both occasions. Well, after the marriage, shortly after, she purported herself to be single. She, both to her friends and associates, she did not, she hid her marriage as the fact finder found. And she had no, neither, in fact, had no explanation at hearing long after the fact for why it made any sense, legitimate sense, to hide the marriage from everyone. Was there an adverse credibility finding here? There was no explicit adverse credibility finding by the immigration judge. Our law is that that equals credibility. This is not an asylum. I know the department's not terribly happy with that law. No, but this is not. But that is our case law. I understand the of course can lead to all kinds of problems, because no witness is, or very few witnesses are ever either all of this or all of that. Well, if her testimony is credible, don't we have to attach weight to her statement of reasons why she filled out forms saying she was single, why she told her friends he was her boyfriend, that sort of thing? Well, I was going to say, Your Honor, this is not an asylum case. This is not a case where all or almost all of the evidence is the testimony and the documents of the applicant. This is a case where the standard at the hearing is preponderance of the evidence. Now, it's clear the I.J. did not give her a clean bill of health. The I.J. didn't wrap it up at the ribbon, I hate to use that expression, and say, well, I find you incredible. But she certainly didn't give her a clean bill of health. And we have in addition to, well, what I'm going to say is what evidence exists aside from her testimony. It's her purported husband's telephonic admission to his other girlfriend, his married girlfriend. That sort of sounded to me like a guy explaining why he wanted to continue an affair. Well, but it sounds to me We're not really married, so I can continue to see you. We're really separated. Well, that's what he comes with later at the hearing. But the point is he told his friend that I agreed to marry her so that she can have an immigration benefit, and I'm going to get to live off base and be subsidized. But they knew before they married that they would not live together, and they did not live together. That poses an interesting evidentiary question, because since there's no adverse credibility finding, and you can't shade her testimony against her, and since separation alone is not enough to suggest you don't have a bona fide marriage, is the I.J. permitted to make some inferences from the fact that they kind of moved all over the place and she said it was just so they could get to work easier? I mean, how do you mix the sort of objective evidence with the no credibility finding here? Well, the board had something to say about credibility. And, of course, it's our position that the immigration judge did not give her a clean bill of health, and she didn't make the express finding the court desires. But the board had something to say about it, and the board said that she and her husband's credibility were questionable. This is a case where you've got two federal agencies investigating something that overlap. You've got an admission by the purported husband. You've got an admission, a written admission by the petitioner. You've got the findings of the DHS investigator, including all of his investigative memoranda and his testimony. He found Well, can I just stop you there just to clarify. Normally, because the I.J. didn't make an explicit determination, we would leave that at neutral. But since the BIA says we adopt the immigration judge, but we have the following additions, and then goes on to say what you just quoted, that they have reason to question, does that then become, in effect, an adverse credibility finding? Or is adverse credibility ruling? I think you can read it that way. I mean, it's explicitly saying more about her credibility than the I.J. did. It's certainly not saying she's credible. If it isn't a credibility finding, it's close to it. How long do you have to have the mutual intent about being married? I don't think there's any defining pronouncement by the court on that. Like Britney Spears got married and then didn't, you know, after a day or 45 minutes. So, I mean, how, what's the benchmark we should look to? Because if she loved him at the beginning, which you say, and then they got married and she really wanted to be married, but then she figures out this is a bad mistake, you know, when does the marriage intent as a legal matter kind of dissolve? Well, the evidence is they never had it. Okay. So you would say they really concocted it from the beginning. What makes that hard is you acknowledge yourself that they did have a pre-existing relationship. I mean, in fact, there are indications they lived together from time to time, at least before the marriage, and there's no reason to think the wedding ceremony would drive them apart. So, if we look at the time of the wedding as what was the intent at that time, there are at least some indications that there was a bona fide relationship of some kind. It's not the strangers being put together here so that somebody gets a benefit and somebody gets paid. There was a relationship here that is a little difficult to define, but it's not out of the blue. No, I don't think it's hard to define it. I think it was a lover's relationship. That's not that far removed from what you would expect for a marriage ceremony. I would hope not, but I won't. I won't, in case the court indeed applies. I have friends that have unusual marriages in different respects. One of the things that makes it hard is you can't have it all the time. Judge, this is not a lifestyle case where we're out in a bunch of free spirits and we're going to do what we want. This is the United States. We can get away with anything. I.N.S. is stupid and all of that stuff. This is not that kind of case. I mean, you're not going to see a marriage fraud case much better than this one. All we've really got is that she comes along at the hearing, long after the fact, long after she's admitted that they engaged in this. He's admitted it. It's been investigated. Documents have been procured. And then she comes along at the hearing and says, well, you know, really, I really did like the guy. But she admitted at hearing that they did not intend to live together, just as she admitted in her statement. They did not intend to live together. What it really is is she had perhaps a hope that something might happen, but it's not credible. It's not persuasive. She knew they wouldn't live together. She knew he had girlfriends. She held herself out as single. They told no one, not family, not friends. And she repeatedly at hearing either wouldn't answer or couldn't answer the questions pertaining to her alleged intent at the time. I think we're out of time. Thank you for your audience here today. Thanks for coming in. For a vote? Thank you, Your Honors. With respect to the issue of them maintaining separate residences, the record also reflects that her own bishop testified that he and his wife, because of conditions with regard to their respective places of employment, her own bishop and his wife lived separately for a time. And that was also on this very same island. Now, the judge's speculation that he could have been living, she could have been living with him out in Pearl City near Pearl Harbor, where he worked, because it doesn't take long to get back and forth from Pearl City to downtown Honolulu. Judge Clifton, who has lived in Honolulu for a number of years, can confirm the fact that to travel that stretch of highways in Honolulu during the early morning or afternoon rush hour is certainly going to take you at least an hour. And that's if you're driving in your own car and not going by bus, as she said she would have to do. What do we do with her admission? I think we have to take a look at the conditions under which those statements were taken, hers in particular. The symptoms she was displaying at the time were the classic symptoms of shock. When I tried to elucidate from Mr. Lasak some information as to his size and his stature, the immigration judge cut me off by simply saying, oh, he's just an average man of average size. Well, that's certainly not true. He's a giant of a man, and this is a woman who's probably 5'4 and perhaps 110 pounds. I mean, she was clearly intimidated by him, and he's a very intimidating man. I know him personally. He's an intimidating man. She was under the understanding that if she didn't sign and approve the statement that he wrote, she wasn't leaving that room. This is not the proper conditions to take a statement like that. But if we were to determine that under the standards set by immigration law that this wasn't a coerced statement, then where would we be in terms of weighing the evidence? I think the evidence still has to be weighed in terms of the circumstances under which that statement was taken, and that, you know, she would have signed anything to get out of there, and she made that fairly clear at the hearing. As to your earlier question about the intent issue, all of the BIA precedent decisions concerning Mary say that the issue is what the intent of the parties was at the time they got married. And these decisions also say that you look to the conduct of the parties before and after to ascertain what their intent was at the time they got married. Well, it's very clear, and counsel for the government has even acknowledged this, that they were lovers for quite some time before they decided to get married. And the testimony of her witnesses, even concerning, you know, what happened after they got married, and I think the most telling is that of Darren Nakamura, is that even when she realized this guy was a two-timing philanderer, she still wanted to do whatever she could to make the marriage work. So the issue of them living separately is fully explained in the terms of the record. It's kind of like Carmela Soprano, huh? It's, it's, I, as I say, I rocken it to Frankie and Johnny. He was her man, he'd done her wrong, but she still tried to stick with it and make the marriage work. Thank you very much.
judges: Hawkins, McKeown,clifton